

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-16-00380-CR

JACOB RYAN DAMM                                                    APPELLANT

V.

THE STATE OF TEXAS                                                      STATE

----------

### FROM THE 372ND DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 1308239D

----------

## MEMORANDUM OPINION[1]

----------

Appellant Jacob Ryan Damm appeals from his conviction for murder and his resulting sentence of ninety-nine years' confinement. He raises sixteen points challenging the admission of several portions of the State's evidence admitted against him, including his custodial statements, and the jury charge.

---

[1]*See* Tex. R. App. P. 47.4.

Because we find either no error or no reversible error, we affirm the trial court's judgment.

## I. BACKGROUND[2]

### A. THE DISAPPEARANCE

Damm sold drugs—mainly marijuana and prescription medications such as Xanax and hydrocodone. Casey Egbers, who was addicted to prescription painkillers, regularly bought drugs from Damm. In fact, Egbers and Damm's relationship revolved around drugs. If Egbers did not have the money to buy drugs from Damm, Damm would arrange for her to have sex with his friends in exchange for the money to buy more drugs.

In August 2012, Casey Egbers moved in with her friend, Josephine Pacheco. Egbers was constantly worried about where she could get drugs and in mid-August 2012, she returned to Pacheco's apartment with "a bunch of pills" after stating that she was walking to Damm's house to steal drugs from him. On August 28, 2012, Egbers tried to steal more drugs from Damm's house and brought Pacheco with her. Egbers tried to enter Damm's home through a back window, but Talor Verran, Damm's girlfriend, saw her. When Verran screamed, Egbers ran back to the car Pacheco was waiting in. During their flight from Damm's house, a police officer pulled their car over and arrested Egbers based on outstanding warrants. Egbers told Pacheco to call Damm to bail her out.

___

[2]Although Damm does not challenge the sufficiency of the evidence to support his conviction, a recitation of the factual and procedural background is needed to place his appellate points in context.

2

That same day, Pacheco discovered that Egbers had told Damm that Pacheco had stolen the drugs from his house. Pacheco called Damm and asked him to come to her apartment. When Damm arrived, he searched Egbers's belongings and found pill bottles that had his mother's name on them. This angered Damm.

Egbers got out of jail the next day—August 29—after her former boyfriend Alex Tarbutton bailed her out. He drove her to a hotel where her father was staying and left. Although Tarbutton texted Egbers later that night, Egbers did not respond, and Tarbutton never saw her again. On August 30 at around 1:00 a.m., Egbers called Damm and they spoke for approximately five minutes. This was the last call made from Egbers's phone.

## B. THE INVESTIGATION

When Egbers did not contact her mother for her birthday on September 22, her family realized "something was wrong." Her father reported her as a missing person, and Detective Todd Murphree with the Euless Police Department was assigned to the case. After Murphree got a partial list of Egbers's cell-phone records, he began investigating who Egbers talked to in the days surrounding her disappearance. Murphree spoke with Pacheco on November 20 and began to focus his investigation on Damm.

On November 23, Murphree went to Damm's home after several unsuccessful attempts to contact him. Damm insisted that he had spoken to Egbers at least a week after she was released from jail even though Murphree told Damm that Egbers's last phone call had been on August 30 to him. Damm

3

also told Murphree that he was at a friend's house in Euless doing "whatever" when Egbers called him on August 30. She asked Damm for drugs and money and offered to have sex with his friends to earn money to buy drugs from him. Damm stated that he refused each request. Murphree could not confirm Damm's alibi.

Murphree then obtained more of Egbers's phone records and records from the cell-phone numbers associated with Damm, Pacheco, and Verran. Based on calls placed between Egbers's and Damm's phones, Murphree got a warrant to search Damm's home and Damm's and Verran's cars, which was executed on December 12. The executing officers arrested Damm and Verran and took them to the Euless jail. At the jail, Damm agreed to speak with Murphree again. Murphree twice recited the required warnings, and Damm stated that he understood them. Murphree confronted Damm with his and Egbers's cell-phone records, which showed that he had gone to Egbers's hotel on August 30 after Egbers had called him. Damm again denied any involvement in Egbers's disappearance and stated that Pacheco was likely involved because she had previously threatened Egbers when Damm had gone to Pacheco's apartment. After approximately forty minutes of questioning, Damm expressly invoked his right to counsel, and Murphree immediately left the room.[3]

---

[3]Later that same day, Damm apparently told Murphree that he wanted to talk to him again. Damm signed a written waiver of his right to counsel before this second conversation. Further, Murphree spoke to Damm on December 14 at Damm's request after Damm signed a second waiver. Neither the second

4

On December 12, Gary Hill, an investigator with the Department of Family and Protective Services (DFPS), spoke to Verran while she was in jail in order to determine appropriate placements for Damm's two children.[4] Hill told Verran that he was not law enforcement, that *Miranda* warnings were not necessary, and that his only concern was for the two children. Hill repeatedly told Verran that if she got immunity and told the police what happened to Egbers, she would be released and could take care of the children. He warned Verran that based on the drugs found in the home she shared with Damm and the two children, she would be facing prison time and probable termination of her parental rights to her son. Verran insisted that she knew nothing about what happened the night Egbers disappeared. After Hill left, Murphree entered the room and questioned Verran to no avail—Verran continued to state that she knew nothing.

The next day—December 13—Murphree again questioned Verran, who stated that Damm had told her that he had accidentally shot Egbers in the back of the head while struggling over a gun. Verran reported that Damm told her he had buried Egbers in a shallow grave. Murphree had Verran accompany him and the search team to Kennedale near Interstate 20 and Highway 287, which Murphree had identified as the location where Egbers might be found based on

_____

interrogation on December 12 nor the questioning on December 14 is at issue in this appeal.

[4]Damm has two children—a daughter with his former girlfriend Heather Bagley and a son with Verran—both of whom lived with Damm and Verran.

5

the cell-phone records. Verran suggested a general area at the site to look for Egbers, and officers thereafter quickly found Egbers's body in a shallow grave covered with tree branches, boards, and other debris. Egbers had been shot two times in the head and her right leg had been severed from her body below the knee.

On December 19, Hill interviewed Damm regarding his children. The police had not allowed him to speak to Damm the week before when he spoke to Verran because the investigation into Egbers's disappearance was ongoing. Hill told Damm that he was "not law enforcement," that the *Miranda* warnings were not necessary, and that a DFPS caseworker had asked him to talk to Damm to get a social history. At some point, Hill believed he had turned off the recording of his interview, but the recording continued. Damm then told Hill in a largely unprompted narrative that Verran had shot Egbers and that he buried Egbers, cutting off her leg to do so, while high on synthetic marijuana. Damm stated that Verran shot Egbers because his two children were at Damm's home with Verran when Egbers had tried to break into the home in August. Hill repeatedly told Damm that he should be telling "the detective" about his involvement in Egbers's death because Hill could be subpoenaed in the criminal case. Damm continued, however, and told Hill that he "would die for" Verran and was willing to "take the murder charge" so his children could stay with Verran.

That same day—December 19—a complaint was filed charging Damm with the commission of Egbers's murder. On March 7, 2013, a grand jury

6

indicted Damm with the murder of Egbers. *See* Tex. Penal Code Ann. § 19.02(b)(1)–(2) (West 2011). Around the time of the indictment, the Euless Police Department contacted the United States Secret Service for assistance in determining the location of three cell phones during the calls and texts between numbers associated with Damm, Verran, and Egbers around the time of Egbers's disappearance in late August 2012. Special Agent Jesse Prewitt, using the cell-phone records provided by Murphree, created a cell-tower map that showed the phones' locations at the time the calls and texts were made from the three phone numbers.

### C. PRETRIAL AND TRIAL

The State notified Damm that it intended to introduce evidence of several prior bad acts committed by Damm, including threats he made in Tarrant County to Bagley, his daughter's mother:

> Defendant threatened Heather Bagley and called her names like [s]lut and whore and pulled a chair [o]ut from under her and said that [h]e had a gun and came there to "shoot her in the vagina" and said [h]e said that because he was mad [a]t her @ 2009-10 and he sent a [t]ext admitting he said it @ 8/18/2015.

*See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3 (West Supp. 2017); Tex. R. Evid. 404(b)(2). The State also notified Damm that Hill had "indicated to [the prosecutors] that . . . Murphree suggested to him [before Hill spoke to Verran on December 12] that if . . . Verran could help in any way to locate [Egbers's] body, to ask her that and to 'try to get her to open up a little and talk about it.'" *See* Tex. Code Crim. Proc. Ann. art. 39.14(a), (h) (West Supp. 2017). The notice

7

further stated that Murphree did not remember the conversation and that Murphree averred Hill was not an agent of the law enforcement.

Damm filed a pretrial motion to suppress his statements given to Hill on December 19, 2012, and his statements given to Murphree between November 23 and late December 2012.  *See id.* art. 38.22, § 3 (West Supp. 2017).  The trial court held an evidentiary hearing, at which Murphree and Hill testified, and denied the motion after making several oral findings of fact.  *See id.* art. 38.22, § 6.

At trial, a jury heard Damm's interviews with Murphree and Hill and the cell-phone-location evidence created by Prewitt.  Damm's theory at trial was that Verran was solely responsible for Egbers's murder.  Verran invoked the Fifth Amendment outside the presence of the jury and did not testify at Damm's trial. The trial court charged the jury and included an instruction on the law of parties and on the effect of Damm's voluntary intoxication:

> Voluntary intoxication does not constitute a defense to the commission of a crime.
>
> A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.
>
> Each party to an offense may be charged with the commission of the offense.
>
> A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense he encourages, directs, aids, or attempts to aid the other person to commit the offense.

Mere presence alone will not constitute one a party to an offense.

See Tex. Penal Code Ann. §§ 7.01–.02, 8.04(a) (West 2011). The jury found Damm guilty of murder.

At punishment, the State introduced testimony regarding the drugs found in Damm's home when the search warrant was executed in December 2012 as well as Damm's prior threats to Bagley. The jury assessed Damm's punishment at ninety-nine years' confinement. The trial court entered judgment in accordance with the jury's verdicts.

Damm filed a motion for new trial arguing that the jury charge was erroneous and that evidence inculpating Verran in the murder was not discovered or disclosed by the State until after the jury's verdict. See Tex. R. App. P. 21.3(b), (h). The motion was deemed denied. See Tex. R. App. P. 21.8(c). Damm now appeals and challenges the admission of several portions of the State's evidence at guilt–innocence and at punishment, including his statements to Hill and his and Verran's statements to Murphree, and the trial court's jury charge regarding Damm's guilt or innocence.

## II. ALLEGED ERRORS OCCURRING AT GUILT–INNOCENCE

In twelve points, Damm argues that portions of the State's evidence introduced against him at guilt–innocence were admitted in error and that the jury charge contained reversible error.

9

## A. EVIDENTIARY COMPLAINTS

In general, we review a trial court's admission of evidence under an abuse-of-discretion standard. *See Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). This means as long as a trial court's decision falls within the zone of reasonable disagreement, we will not disturb it. *See id.* at 83.

### 1. Admission of Damm's December 19 Statement to Hill

In his first point, Damm argues, as he did in his pretrial motion to suppress, that the admission of his unwarned, December 19 statement to Hill violated his constitutional rights against self-incrimination because Hill was working in tandem with law enforcement. Damm points to the fact that Murphree asked for Hill's assistance in finding Egbers's body before Hill's interview with Verran and to Hill's subsequent advice to Verran during his interview with her on December 12 that she should help the police find Egbers.

After the trial court's evidentiary hearing on Damm's motion to suppress, the trial court concluded that Damm's statements to Hill on December 19 were not subject to suppression based on the following oral findings:

> As to the 38.22 interview, the [DFPS] interview and whether 38.22 is applicable. [Trial judge states that he will apply *Wilkerson v. State*, 173 S.W.3d 521 (Tex. Crim. App. 2005) to his determination of Damm's motion to suppress.]
>
> I fully understand after reviewing . . . the Talor Verran interview [with Hill on December 12], why the Defense wanted me to see it. And I totally understand that the Defense position is if they're going to help the police with Talor, well, then that means they were helping the police with Mr. Damm and therefore they surrendered an independent status, if they did, at the beginning of the investigation

10

and it applies to any and all actions they take for the rest of his career, at least concerning the chain of events involving what brings us to court here today.

And the Court's position is that's an excellent and skilled legal argument, but I think as a matter of law it's a stretch. And I tend to agree after reviewing other cases that each defendant's circumstances are judged on their own, considering all surrounding evidence as may affect it. But the issue is not what should or shouldn't have happened, what did or didn't happen in Talor's interview. And I will say as a matter of common sense, the [DFPS] officer didn't say he didn't have the conversation [with Murphree]. He said he didn't remember anything. If he did, he doesn't remember anything about it. He didn't deny it.[5] And I can totally understand the detective trying to solve a case, bring closure to a family, telling anyone that talks to a defendant, including their mother, "If you help find out where the body is, it's appreciated." And whether the [DFPS] person or family member or whoever else would visit with an accused chooses to cooperate or not I guess would be their choice. But the issue is what's going on a week later, on the eighth day after the initial interview.

And it's the Court's position if he were going to be acting as an agent, implied, expressed or otherwise, of Euless Police Department, then I'm thinking they shouldn't have denied him access to even talk to him to do his job on the 12th, says, "We're conducting our investigation. You can't talk to him." And he had to wait until they were completely through with their investigation before he was even allowed to talk to the Defendant, as opposed to talking to Talor immediately.

So as much as the inference that you properly raised that what's going on with Talor carries over to Jacob, it's clear that Jacob's situation was completely separated, or else the agent's business all would have taken place on the 12th when he came there to interview two people and not one, but had to stand down.

---

[5]At the hearing, Hill testified that he did not "have any personal recollection" of talking with Murphree before interviewing Verran on December 12.

11

The test employed by Wilkerson says to look at several things, which is to find out if the . . . civilian, regardless of having a government job or a [DFPS] job, anyone who's enlisted as an agent . . . is bound by Miranda requirements when they're acting at or under the direction of a law enforcement officer. . . .

The first prong of that test is to determine whether law enforcement was attempting to use the interviewer as its anointed agent. . . . The Court finds as a matter of fact, concludes as a matter of law the answer is no, based upon the interview being eight days . . . after the arrest, that the fact that law enforcement blocked access to the [DFPS] worker to interview Jacob Damm, the intervening circumstances, and the Court finds factually that law enforcement was not trying to manipulate . . . Hill, to act as its anointed agent.

The second prong of the test is whether the interviewer them self [sic] believes they were acting as an agent of law enforcement. And I was almost embarrassed to the extent of which this person on the face of the tape was trying to backpedal himself away from law enforcement . . . . And at the end, maybe, maybe trying too hard, saying, "You need to tell this to the detective. You don't need to be telling this to me." "I can be subpoenaed." . . . And in candor and fairness to the Defendant, at the front end, "I'm [DFPS], but you need to know this isn't going to be confidential. I could be subpoenaed. Other people can get this information. It's not like it's privileged."

The third prong of the test is whether a reasonable person in the Defendant's position would have believed the interviewer was an agent of law enforcement. Looking at the totality of the circumstances and the contact, particularly in light of "I want to see your credentials," particularly in light of the numerous disclosures in using a reasonable man's standard, I believe the answer to that question is no. . . .

The next prong of the test is determining whether the interviewer was acting as an instrumentality or conduit for the police or the prosecution, or . . . in cahoots with the police. . . . And based on the reasons previously stated, the Court finds as a matter of fact, concludes as a matter of law the answer to that question is no.

12

And the Court finds as a matter of fact, concludes as a matter of law, the [DFPS] worker did have a statutory right and duty to interview the incarcerated parents of two small children, who at the time of the short history of the arrest, the arrest warrant information, everything I've read, were in custody for drug-related offenses, which would require the interview whether anyone was missing or murdered or otherwise on the welfare of the children.

. . . .

But the point of this is the Defendant's graphic descriptions of what's going on even throughout that in his efforts to protect [Verran], who he loves unconditionally. The worker [Hill] kept reinforcing: There are children involved; if this happened, it can happen again; . . . if she would do that, your children could be at risk. So the focus, notwithstanding graphic and crime drama language going on throughout the interview, the agent stayed tethered - - the [DFPS] agent, should I say, stayed tethered to his statutory function. And I make those findings for purposes of this interview, and I'm not making findings - - Talor Verran is not on trial. And I don't know what my rulings would be with a fleshed-out record from her attorneys and arguments and other circumstances.

So the Court finds factually that all three interviews I have reviewed are admissible, that 38.22 and the Sixth Amendment challenges are not applicable to the [DFPS] interview based upon the test, that as a legal matter, not it isn't herculean and stellar legal efforts, I just find legally you have not met the burden of proving the [DFPS] worker as to Jacob Damm and that specific interview, as acting as an agent of the State. I do not make judgments on what they did or didn't do on other dates on other cases, related or unrelated to this one.

No party requested the trial court to file formal findings of fact and conclusions of law.

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review, conferring almost total deference on any historical-fact and application-of-law-to-fact questions that turn on an evaluation of

13

credibility and demeanor and reviewing de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007); *State v. Kelly*, 204 S.W.3d 808, 818–19 (Tex. Crim. App. 2006). A trial court's findings may be written or oral. *State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006). Accordingly, even if neither party requested written findings of fact and conclusions of law and none were filed, we may consider oral findings of fact to be entered of record and given due deference if, as is true in this case, it is apparent from the record that the trial court intended its findings and conclusions to be expressed through its oral pronouncements. *See State v. Varley*, 501 S.W.3d 273, 277–78 (Tex. App.—Fort Worth 2016, pet. ref'd).

An oral statement that is the result of custodial interrogation may be admitted against a defendant if procedural safeguards sufficient to protect the defendant's constitutional protection against self-incrimination were employed. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 3; *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). These safeguards apply if the statement is the result of an interrogation by law-enforcement officers or their agents. *See Berry v. State*, 233 S.W.3d 847, 855 (Tex. Crim. App. 2007). Damm argues that Hill was an

14

agent of law enforcement as shown by the circumstances surrounding his December 19 interview and Verran's December 12 interview with Hill.

Hill's status as a State employee is insufficient, standing alone, to conclude he was an agent for purposes of *Miranda* and article 38.22. *See id.* We must determine whether Hill was acting as an agent of law enforcement on December 19 based on the entire record in order to answer the "essential inquiry": "Was this custodial interview conducted (explicitly or implicitly) on behalf of the police for the primary purpose of gathering evidence or statements to be used in a later criminal proceeding against the interviewee?" *Id.*; *Wilkerson*, 173 S.W.3d at 531. In other words, we ask whether Hill was "'in cahoots' with the police." *Wilkerson*, 173 S.W.3d at 531. To answer this ultimate inquiry, we examine the record for information regarding the relationship between Murphree and Hill, Hill's actions and perceptions, and Damm's perceptions of the encounter. *See id.* at 530–31. Damm had the burden in the trial court to prove that Hill was acting in tandem with law enforcement. *See id.* at 529.

As concluded by the trial court, the record from the suppression hearing shows that the relationship between Murphree and Hill was not an agency. Hill testified that neither Murphree nor any other law-enforcement officer was present at or monitoring his December 19 interview with Damm. No law-enforcement officer asked Hill to assist in the investigation of Egbers's murder during his interview with Damm on December 19. Indeed, by the time Hill was allowed to speak to Damm, Murphree's investigation was largely complete because he had

15

found Egbers's body the week before. Hill's December 19 interview with Damm was solely for the purpose of protecting the two children. Murphree testified that he had not asked Hill to speak to Damm or to get information from Damm. In sum, Murphree was not attempting to use Hill as his anointed agent on December 19. *See id.* at 532–33; *Rodriguez-Flores v. State*, 351 S.W.3d 612, 633 (Tex. App.—Austin 2011, pet. ref'd); *Moore v. State*, 233 S.W.3d 32, 41–42 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

The record also supported the trial court's conclusion that Hill did not believe he was acting in tandem with law enforcement based on Hill's actions and perceptions during his December 19 interview with Damm. *See Berry*, 233 S.W.3d at 855–56; *Moore*, 233 S.W.3d at 42–43. Hill testified that he believed he was functioning as a DFPS investigator. In fact, Hill clearly stated to Damm that he was investigating on behalf of DFPS and that he was not law enforcement. And Hill repeatedly told Damm that he would have to disclose Damm's unprompted statements about his involvement in Egbers's murder to law enforcement. Damm's inculpatory statements to Hill were not the result of any specific questioning by Hill about the murder.

Finally, the record supported the trial court's conclusion that a reasonable person in Damm's position would not have believed Hill was acting on behalf of law enforcement. *See Berry*, 233 S.W.3d at 856; *Rodriguez-Flores*, 351 S.W.3d at 634; *Vanegas v. State*, No. 2-08-356-CR, 2009 WL 3246745, at *11–12 (Tex. App.—Fort Worth Oct. 8, 2009, no pet.) (mem. op., not designated for

16

publication).  Hill clearly told Damm that he was not a law-enforcement officer and repeatedly told Damm that Hill would be required to share any information about the murder with the police.

We conclude, giving due deference to the trial court's findings, that the entire record shows that Hill's interview with Damm on December 19 was not conducted on behalf of law enforcement for the primary purpose of gathering evidence or statements to be used in a later criminal proceeding against Damm. Thus, the admission of Damm's unwarned statements to Hill was not an abuse of the trial court's discretion.  *See Berry*, 233 S.W.3d at 856; *Wilkerson*, 173 S.W.3d at 533.  And we agree with the trial court and the State that Damm's argument equating Hill's actions in his interview with Verran to a conclusion that Hill was acting as an agent of law enforcement a week later goes outside the test pronounced in *Berry* and *Wilkerson* and is, in effect, an impermissible attempt to vicariously assert Verran's protections against self-incrimination.  *See generally Etter v. State*, 679 S.W.2d 511, 515 (Tex. Crim. App. 1984) ("As is well known, the privilege against self-incrimination is personal to the witness and can be asserted only by him.").  We overrule point one.

### 2.  Admission of Damm's December 12 Statement to Murphree

In his fourteenth and fifteenth points, Damm argues that the trial court abused its discretion by admitting his custodial statements made to Murphree on December 12 because Damm did not actually and voluntarily waive his rights to remain silent and to counsel.  *See* U.S. Const. amend. V, VI; Tex. Code Crim.

17

Proc. Ann. art. 38.22, § 3(a)(2). Damm asserts that although he told Murphree that he understood the warnings Murphree recited before the custodial interrogation began, Murphree failed to then ask if Damm "was willing to voluntarily speak to Murphree." Once again, the trial court's admission of the statement is reviewed for an abuse of discretion; but in the context of Damm's motion to suppress, we review that ruling under the bifurcated standard.

At the hearing on Damm's motion to suppress, Murphree testified that he twice recited the required warnings to Damm, which is also shown in the video of Murphree's December 12 interrogation. Damm affirmed that he understood the warnings and, indeed, invoked his right to counsel after speaking to Murphree for approximately forty minutes. The trial court concluded that Damm's December 12 statement to Murphree was admissible:

> The Court finds as a factual matter that the statutory language of 38.22, 3(a)2, which states that prior to the statement but during the recording the accused is given the warnings as required, that that was, in fact, done. The requirements under Section 2 were given to the Defendant. They were given twice because it appears he didn't hear. It was repeated. "Do you understand it?"
>
> Eye contact, "Yes." The Court does find there was no express at the outset of the interview waiver as would have been provided in Section 2 in writing on a written document. And there wasn't even the question, "Are you willing to talk to me?" There was a conversation. And if there were not case law for a considerable period of time from the Court of Criminal Appeals and lower courts that waiver can be inferred based on the totality of the conversation and the circumstances, we'd be done, just as if there wasn't on the face of the written statement, one of the warnings that is required.
>
> So the Court's required to review the entirety of the conversation and determine whether or not there is an implied

18

waiver based upon the nature of the Defendant's statements, the manner in which they were made, whether they were voluntary, which, quite frankly, is a separate and independent test under 38.22. And it's the Court's belief based on the totality of the statement that especially in conjunction with the entire record, but resting on the face of that video as is required to be on the face of the video, not the prior conversation or subsequent conversations with other persons, the Court's not considering that. I'm not comparing conversations. I don't think it's allowed. Plus, 38.22 requires it to be on the video that's being offered.

I find that the Defendant was as much involved in the conversation as the detective. And, quite frankly, based upon the manner and means by which he invoked his right to counsel . . . after . . . it was clear that the information he was providing wasn't being bought, he promptly and intelligently invoked his right to counsel, which indicates to the Court he fully understood his rights, that he waived his rights not to talk, or he could have said those words at the front end, because he didn't hesitate to do it and openly discussed a bunch of other unrelated matters, which is clear to anyone with common sense that anyone would know might be incriminating. . . .

And therefore, for those reasons, the Court believes based on the totality of the record that the Defendant's statements to Detective Murphree as recorded on the 12/12 Euless PD custodial interview are legally admissible considering the entire record, particularly the details and tenor of the conversation and the "I believe you lied to me."

"No, sir, I did not," and off it went. And so your motion to suppress on the grounds raised in writing, particularly your Sixth Amendment grounds, are overruled up to the point where he invoked his right to counsel.

An accused's waiver of his constitutional and article 38.22 rights must be voluntary, knowing, and intelligent. Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a)(2). The waiver may be explicit or implicit. *Joseph v. State*, 309 S.W.3d 20, 24–25 (Tex. Crim. App. 2010); *Watson v. State*, 762 S.W.2d 591, 601 (Tex.

Crim. App. 1988). The State bears the burden by a preponderance to show a compliant waiver to justify admission of a custodial statement. *Joseph*, 309 S.W.3d at 24.

We conclude, giving due deference to the trial court's findings, that the entirety of the record reveals by a preponderance that Damm voluntarily waived his rights to counsel and to remain silent before speaking with Murphree on December 12. Even though Damm did not explicitly state that he waived his rights, his conduct and the surrounding circumstances show that he affirmed he understood his rights and agreed to talk to Murphree for an extended time before invoking his right to counsel. These facts as found by the trial court are sufficient for a conclusion that Damm voluntarily, knowingly, and expressly waived his constitutional and statutory rights before answering Murphree's questions. *See, e.g.*, *Montoya v. State*, Nos. 02-08-287-CR, 02-08-288-CR, 02-08-289-CR, 2010 WL 1633387, at *10 (Tex. App.—Fort Worth Apr. 22, 2010, pet. ref'd, untimely filed) (mem. op., not designated for publication); *State v. Oliver*, 29 S.W.3d 190, 191–93 (Tex. App.—San Antonio 2000, pet. ref'd). Based on this waiver, the trial court did not abuse its discretion by admitting Damm's December 12 statement. We overrule points fourteen and fifteen.

### 3. Admission of Verran's December 13 Statement to Murphree

In his second point, Damm argues that the trial court abused its discretion by admitting "testimonial statements" Verran made to Murphree on December 13. After the State rested its case-in-chief, Damm introduced a letter Verran wrote to

Damm while he was in jail in which she wrote that she had put him in a "dung[e]on." Damm introduced the letter during his direct examination of his private investigator, who had acquired the letter from Damm's mother, Alysia Damm. The trial court admitted the letter over the State's hearsay objection. Also during his direct examination of the investigator, Damm introduced a recording Alysia had made of a conversation she had with Verran in which Verran affirmed that she alone twice shot Egbers. The trial court admitted the recordings of this conversation into evidence.

In rebuttal, the State called as witnesses (1) Verran's brother, who testified that Verran affirmed to him that Damm had killed Egbers, and (2) Verran's sister-in-law, who testified that Verran never represented that she had killed Egbers. In both instances, the trial court immediately gave the jury a limiting instruction at Damm's request that the testimony was admitted for impeachment or credibility purposes, not for its truth.[6] The jurors verbally verified each time that they understood the limiting instructions. The State additionally recalled Murphree as a witness in rebuttal and introduced portions of Murphree's custodial interview with Verran on December 13 in which she stated that Damm acted alone when he shot and buried Egbers. Damm objected to Verran's December 13 statements, arguing that the admission violated his federal and state constitutional rights to confrontation. Damm pointed out that he had introduced

_____

[6]The instruction was also included in the trial court's jury charge.

21

only nontestimonial statements by Verran; therefore, her testimonial statements to Murphree could not be admitted without violating his confrontation rights.

The trial court concluded that Verran's December 13 oral statements were admissible to impeach Verran's letter and recorded conversation, which Damm had admitted in his case-in-chief:

> [H]aving considered everything, having considered the fact that these statements will be admitted to impeach the statements offered by and through recordings, letters and other sources introduced in an aggressive Defense strategy to put Talor Verran pulling the trigger in this offense, I'm going to overrule your Sixth Amendment U.S. constitutional objection, your Article 1, Section 10, Texas constitutional objection to the use of [Verran's December 13 oral statements to Murphree] for the purposes of impeachment.
>
> I will give a limiting instruction . . . as I have done on the noncustodial statements. It's . . . intelligent to suggest there's a distinction. I'm not aware of any case law that makes a distinction between the form of which evidence may be impeached. It's a decision, I think a tactical decision, and, quite frankly, candidly, a proper one based on the evidence I've heard, but I don't think you can have your cake and eat it, too. . . .

The trial court orally instructed the jury that the evidence was admitted for impeachment purposes and not for its truth. The jurors verbally stated that they could follow the limiting instruction.

On appeal, Damm continues to draw a distinction between testimonial and nontestimonal statements for purposes of his confrontation rights under the United States Constitution.[7] He asserts that because Verran's letter and

---

[7]Damm briefed the application of only his federal confrontation rights, failing to include cogent argument applying the Texas Constitution and the code of criminal procedure. *See* Tex. R. App. P. 38.1(i). We will address this issue as

22

recorded conversation with Alysia were nontestimonal, the State could not impeach them with Verran's contrary, testimonial assertions to Murphree because Verran was unavailable for trial based on her prior invocation of the Fifth Amendment. The State does not dispute that Verran's statements to Murphree were testimonial, but argues that the testimonial–nontestimonial distinction is irrelevant regarding whether her December 13 statements were admissible to address Verran's credibility, which Damm put at issue by introducing Verran's letter and recorded conversation with Alysia. We review the admission of Verran's testimonial statements for an abuse of discretion, giving due deference to factual determinations and reviewing de novo the application of the law regarding the Confrontation Clause to those facts. *See Wood v. State*, 299 S.W.3d 200, 207–08 (Tex. App.—Austin 2009, pet. ref'd) (citing *Wall v. State*, 184 S.W.3d 730, 742–43 (Tex. Crim. App. 2006) and applying hybrid standard of review to admissibility of testimonial statement over Sixth Amendment objection).

The Confrontation Clause prohibits the admission of a declarant's testimonial statements unless the declarant is not available to testify and the accused had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 42 (2004); *see* U.S. Const. amend. VI. And although such a

Damm briefed it—under the United States Constitution. *See Buntion v. State*, 482 S.W.3d 58, 70 n.3 (Tex. Crim. App. 2016); *Merrick v. State*, Nos. 02-17-00035-CR, 02-17-00036-CR, 2018 WL 651375, at *4 (Tex. App.—Fort Worth Feb. 1, 2018, no pet. h.).

23

hearsay statement may be admissible under the rules of evidence, it nevertheless must overcome the Confrontation-Clause bar, which is implicated if the defendant did not have an opportunity to confront the declarant. *See Del Carmen Hernandez v. State*, 273 S.W.3d 685, 687 (Tex. Crim. App. 2008). However, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)).

Here, Damm placed Verran's credibility at issue by introducing the letter and the conversation in which she took sole responsibility for Egbers's murder. The State was entitled in rebuttal to introduce Verran's contrary, testimonial statement to Murphree in which she stated only Damm killed and buried Egbers. *See Del Carmen Hernandez*, 273 S.W.3d at 688; *see also* Tex. R. Evid. 806. Like the trial court, we see no distinction in the case law interpreting the Confrontation Clause that would allow us to conclude that a nontestimonial statement may be impeached only with nontestimonial evidence. Although the court of criminal appeals recognized in *Del Carmen Hernandez* that the State introduced a testimonial statement by a co-defendant to impeach a contrary testimonial statement by that co-defendant previously introduced by the defendant, the court's holding was not based on a testimonial–nontestimonial distinction. *Del Carmen Hernandez*, 273 S.W.3d at 686–87. It was based on the purposes for which the testimonial statement was offered: "The statement

24

[offered in rebuttal by the State], as nonhearsay, did not implicate the appellant's confrontation rights and was therefore admissible under *Crawford*. In so holding, we reject the appellant's contention that Rule 806 is in conflict with the principles of *Crawford*." *Id.* at 688–89. Verran's testimonial statement was not offered to prove that Damm acted alone but was offered to impeach her prior nontestimonial statements to Damm and Alysia that she shot Egbers. This is a permissible purpose under the rules of evidence and does not implicate the Confrontation Clause. *See id.*; *see also Crawford*, 541 U.S. at 59 n.9. After giving due deference to the trial court's findings and applying the legal principles de novo, we conclude that the trial court did not abuse its discretion in admitting Verran's statement to Murphree. We overrule point two.

### 4. Admission of Evidence Attributing Cell-Phone Number to Damm

In points three and four, Damm argues that the trial court abused its discretion by admitting Prewitt's diagrams, Prewitt's expert testimony, and Murphree's testimony attributing a certain cell-phone number, ending in 7797, to Damm because it was inadmissible hearsay and speculative. At trial, Damm objected to both Prewitt's and Murphree's testimony based on hearsay and speculation. We review the admission of this evidence over objection for an abuse of discretion. *See Bosquez v. State*, 446 S.W.3d 581, 585 (Tex. App.—Fort Worth 2014, pet. ref'd) (mem. op.). For the following reasons, we overrule points three and four.

25

## a. Prewitt

At trial, the State introduced Prewitt's color-coded diagrams showing where three cell phones were located around the time of Egbers's murder. In a hearing outside the jury's presence to determine their admissibility, Prewitt testified that he assumed the numbers provided belonged to Egbers, Damm, and Verran because that was the information Murphree gave him. Damm objected to the admission of the diagrams because they were "speculation" that "these are the individuals who made these phone calls." He also objected that because Prewitt included on the exhibits the hearsay information provided by Murphree—who was associated with which cell-phone number—it was inadmissible hearsay. Damm conceded that Prewitt could base his expert opinion on hearsay. The trial court overruled Damm's speculation and hearsay objections because Prewitt testified that "he can't say who called who, these are associated with the number for identification purposes and [Damm could] cross [Prewitt] on that issue and [the] State makes it clear he doesn't testify people made calls, that it's just for reference issue only." The trial court sua sponte offered to give the jury a limiting instruction "that the code at the bottom is for reference and is not evidence that the individuals actually placed calls." Damm's counsel stated, "I like that limiting instruction."

At the outset of Prewitt's testimony before the jury, the trial court again overruled Damm's objections to the diagrams when offered by the State and instructed the jury that the diagrams could not be "considered as evidence of who

26

made calls as opposed to a number that may be associated with the name." In other words, "[i]t concerns a phone number, not an individual." The jurors verbally affirmed that they understood the instruction. The trial court asked Damm's counsel if the instruction was "adequate," and counsel responded, "Yes, Your Honor." Prewitt's ensuing testimony was not that certain people made the calls mapped on the diagrams or that a certain number belonged to a particular person. Prewitt testified to where a call was made from and when the call was made, not that Damm, Egbers, or Verran actually made the calls at issue.

Because Prewitt's testimony about the diagrams was not offered for the purpose of proving that the 7797 number was actually Damm's but was offered to provide a circumstantial link between Damm, Verran, and Egbers when Egbers was murdered, it was not hearsay. *See Guidry v. State*, 9 S.W.3d 133, 152 (Tex. Crim. App. 1999). Therefore, the trial court did not abuse its discretion by admitting the diagrams over Damm's hearsay objection.

Further, other testimony was admitted at trial without objection that Damm's cell-phone number was the 7797 number, which was the number Prewitt associated with Damm in his diagrams. For example, a visitation-services coordinator with Tarrant County's domestic-relations office testified that Damm listed the 7797 number on an intake form in May 2012 as his cell-phone number. Further, a man who regularly bought drugs from Damm testified that he used the 7797 number to contact Damm or, if he was unavailable, Verran. Finally, a forensic-computer examiner testified that instant messages that had been stored

27

on a laptop at Damm's home showed that "Tay" sent messages to the 7797 number on August 28, 2012, and addressed one to "Jacob." Thus, the admission of Prewitt's testimony, even if an abuse of discretion, would be rendered harmless. *See Hailey v. State*, 413 S.W.3d 457, 469 (Tex. App.—Fort Worth 2012, pet. ref'd).

The trial court also did not abuse its discretion by overruling Damm's speculation objection. As Damm recognized at trial, Prewitt was an expert and was not restricted to his own personal knowledge. *See* Tex. R. Evid. 602. Prewitt was entitled to rely on the facts and data provided by Murphree to aid the jury in determining a fact in issue. *See* Tex. R. Evid. 703; *Harlan v. State*, No. 06-14-00236-CR, 2015 WL 5158457, at *6 (Tex. App.—Texarkana Sept. 3, 2015, pet. ref'd) (mem. op., not designated for publication). Even if an abuse, however, other evidence was admitted at trial without objection that linked Damm to the 7797 number, negating any harm arising from the error. *See Hailey*, 413 S.W.3d at 469.

### b. Murphree

Damm raises the same arguments regarding Murphree's phone-number testimony. But based on the similar evidence linking Damm to the number used by Murphree and Prewitt, which was admitted elsewhere during the trial with no objection, we could not conclude that any error in the admission of Murphree's testimony attributing the 7797 number to Damm resulted in harm requiring reversal. *See* Tex. R. App. P. 44.2(b).

28

## 5. Denial of Limiting Instruction

In point five, Damm argues that the trial court erred by refusing his request for a limiting instruction directed to Murphree's testimony regarding the association of Damm to a specific cell-phone number.[8] After Murphree testified that he received "some records pertaining to Jacob Damm's phone" during his investigation of Egbers's disappearance, Damm requested a limiting instruction under rule 105 to "tell the jury you get to decide who's using the phone" based on the admitted evidence including other evidence linking the number to Damm. *See* Tex. R. Evid. 105. Damm later clarified that any reference to a number "associated with Jacob Damm" would not require a limiting instruction, while a statement of "[the] Jacob Damm phone or the Jacob Damm cell number" would require such an instruction. The trial court denied Damm's request

> because it's not admitted for a limited purpose. It's admitted as what it is, to be inferred as proper or disregarded by the jury as irrelevant according to their standards in assessing the facts. But I did clearly understand your request and the source of it, and I'm overruling it because I'm not admitting it for limited purposes. I'm limiting the witness and the State from saying who called who absent there being a more factual background connecting the call to a person versus a number.
>
> . . . .

---

[8]Damm argues points three, four, and five together but restricts this portion of his argument to Murphree's testimony. Indeed, Damm received his requested limiting instruction during Prewitt's testimony about the phone number. *Cf. Plante v. State*, 692 S.W.2d 487, 493 (Tex. Crim. App. 1985) (holding appellant could not complain on appeal about trial court's limiting instruction, which was instruction appellant requested).

29

. . . You can't say he talked to her based on the phone call unless there's other evidence, there actually was a conversation that is corroborated by the numbers, as opposed to this number means who called who on a certain day and who was using the phone.

Damm's counsel stated that he "absolutely agree[d]" with the trial court.

Rule 105 requires a trial court upon request to instruct a jury if evidence is admitted for a limited purpose. Tex. R. Evid. 105(a). But such an instruction is not required where the evidence is relevant to "any of the main issues in the case." *Cox v. State*, 316 S.W.2d 891, 893 (Tex. Crim. App. 1958); *see, e.g.*, *King v. State*, 189 S.W.3d 347, 356–57 (Tex. App.—Fort Worth 2006, no pet.). In this case and as noted by the trial court, the cell-phone evidence was directly relevant to the State's circumstantial case proving Damm's presence at and, therefore, involvement in Egbers's murder; thus, no limiting instruction was required. *Cox*, 189 S.W.2d at 893. In any event, based on the limiting instruction in the jury charge and based on the rule 105 instruction that was given during Prewitt's similar testimony, we would be unable to conclude that any error arising from the denial was harmful. *See Almendarez v. State*, No. 02-09-00343-CR, 2011 WL 5984689, at *9 (Tex. App.—Fort Worth Dec. 1, 2011, pet. ref'd) (mem. op., not designated for publication); *Jones v. State*, 119 S.W.3d 412, 424–25 (Tex. App.—Fort Worth 2003, no pet.). We overrule point five.

## 6. Admission of Recorded Phone Call Between Damm and Alysia

In his seventh, eight, and ninth points, Damm argues that the trial court abused its discretion by admitting a recorded phone call between him and Alysia

30

because it was inadmissible hearsay and was unfairly prejudicial as compared to its probity. In the phone call, which occurred on December 23, 2012, while Damm was in jail, Alysia recounted to Damm that Verran told others that Damm had "acted solely" and that Verran "was never there."[9] They also discussed that Damm and Verran should quickly get married "by proxy" so they could not be forced to testify against each other.[10] Damm objected that the recording was "inadmissible hearsay" and was "hearsay within hearsay." Damm further stated that he had "a 403 objection" to Alysia's statement that Verran said he acted alone. The trial court overruled the hearsay objections. The trial court also overruled the "403 objection": "And secondly, your 403 objection, balancing this statement against the entire record and what's in front of the jury, I find your 403 objection is also overruled." Even so, the trial court gave the jurors a limiting instruction before they heard the recording:

> Statements made by anyone other than the Defendant on the face of the recording, or attributed to third parties by someone other than the Defendant on the face of the recording, cannot be considered by you for the truth of the matters asserted, but only to assist you, if they do, in understanding the Defendant's statements or responses or the context of the conversation.

The jurors verbally affirmed that they understood the instruction.

---

[9]At the beginning of the call, Damm was warned that the call would be recorded.

[10]Indeed, Damm and Verran were issued a marriage license on January 10, 2013.

31

Such a limiting instruction generally cures any admissibility errors and requires us to presume that the jury followed the instruction, which was additionally included in the trial court's charge at guilt–innocence. *See Gamboa v. State*, 296 S.W.3d 574, 580 & nn.12–13 (Tex. Crim. App. 2009). This presumption is rebuttable, but Damm points to no specific evidence in rebuttal. *See Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998). Further, Damm did not file a motion for new trial alleging juror misconduct or obtain a hearing to adduce facts not in the record. Accordingly, we presume the jury followed the trial court's instruction, which cures any potential hearsay concerns arising from the admission of the phone call even if its admission was an abuse of discretion. *See id.* We overrule points seven and nine.

The State argues that Damm's eighth point was not preserved for our review because his "403 objection" was insufficiently specific. *See* Tex. R. App. P. 33.1(a)(1)(A); *see also* Tex. R. Evid. 103 (a)(1)(B). Indeed, Damm failed to specify under which of the five exclusion grounds listed in rule 403 the otherwise relevant evidence should be excluded: "unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. Damm's general objection merely mentioning "403" did not provide the trial judge with a specific ground on which to rule, and there is no indication in the record that the trial court understood from its context that Damm's objection was brought under a specific portion of rule 403. *See* Tex. R. App. P. 33.1(a)(1)(A). Therefore, Damm did not preserve this objection for our

review. *See, e.g.*, *Lewis v. State*, No. 02-16-00179-CR, 2017 WL 2686325, at *9 (Tex. App.—Fort Worth June 22, 2017, pet. ref'd) (mem. op., not designated for publication); *Checo v. State*, 402 S.W.3d 440, 451 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd); *Phelps v. State*, 999 S.W.2d 512, 520 (Tex. App.— Eastland 1999, pet. ref'd); *Williams v. State*, 930 S.W.2d 898, 901 (Tex. App.— Houston [1st Dist.] 1996, pet. ref'd); *cf. Gutierrez v. State*, No. 02-17-00077-CR, 2017 WL 4296623, at *1–2 (Tex. App.—Fort Worth Sept. 28, 2017, pet. ref'd) (mem. op., not designated for publication) (holding appellant's trial objection that evidence was inadmissible based on rule 401, rule 402, and "also prejudicial" preserved appellate argument under the unfair-prejudice ground of rule 403). We overrule point eight.

## B. JURY CHARGE

### 1. Parties

In his twelfth point, Damm argues that the trial court erred by including a parties instruction in the jury charge at guilt–innocence. Damm objected to the inclusion of the instruction in the charge and proffered a proposed charge that excluded it from the jury's consideration. *See* Tex. Code Crim. Proc. Ann. art. 36.14 (West 2007). The trial court overruled Damm's objection. Damm concedes that the evidence was "extant to submit whether Damm committed the offense as a principal," but asserts, as he did to the trial court, that there was insufficient evidence that he aided or encouraged Verran with the requisite, specific intent. In reviewing alleged jury-charge error, we first determine whether

33

error occurred. *See Cortez v. State*, 469 S.W.3d 593, 598 (Tex. Crim. App. 2015). If we find no error, our inquiry ends.

A law-of-parties instruction is proper in the jury charge if sufficient evidence supports a jury verdict that the defendant is criminally responsible under the law of parties. *See Ladd v. State*, 3 S.W.3d 547, 564 (Tex. Crim. App. 1999). A person is criminally responsible for purposes of the law of parties if the offense is "committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." Tex. Penal Code Ann. § 7.01(a); *see also id.* § 7.02 (defining criminal responsibility for another's conduct). The State may rely on circumstantial evidence, as well as any actions before, during, and after the offense was committed, to prove the necessary specific intent under the law of parties. *Cary v. State*, 507 S.W.3d 750, 758 (Tex. Crim. App. 2016).

Here, the evidence was sufficient to justify the submission of a parties instruction in the jury charge. The jury heard Alysia's conversation with Verran in which Verran stated that she shot Egbers and after hearing blood "gurgle" in Egbers's throat, shot her again. Verran wrote Damm a letter in which she indicated that she was the reason Damm was in jail. Damm told Hill that Verran shot Egbers twice and that Damm dug the grave, cutting off Egbers's leg so her body would fit. Damm explained that Verran was "so angry" at Egbers because she had tried to break into their home while Damm's children were there. And Pacheco testified that the day before Egbers got out of jail, Damm became "angry" when he discovered his pill bottles at Egbers's apartment.

34

This circumstantial evidence was sufficient for a reasonable juror to find that both Verran and Damm were motivated to murder Egbers, that Damm dug the grave in preparation for the murder, and that Verran twice shot Egbers. The jury could have inferred that the murder was premeditated and that Verran and Damm had a common understanding to commit the murder. Accordingly, the trial court did not err by including a parties instruction in the charge. *See, e.g.*, *Ryser v. State*, 453 S.W.3d 17, 28–29 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). We overrule point twelve.

## 2. Voluntary Intoxication

Damm argues in his sixteenth point that the trial court erred in the submission of its voluntary-intoxication instruction because it misled the jury and lessened the State's burden of proof. Specifically, he contends that "as written, a jury following the instruction would read it to mean that if the accused is intoxicated, he has no defense to the commission of the crime." In its charge, the trial court stated that "[v]oluntary intoxication does not constitute a defense to the commission of a crime."[11] The court of criminal appeals has rejected Damm's argument and has held that a similar instruction on voluntary intoxication did not lessen the State's burden of proof or mislead the jury. *See Sakil v. State*, 287 S.W.3d 23, 26–28 (Tex. Crim. App. 2009). We overrule point sixteen.

---

[11]Damm objected to the instruction and submitted an alternate instruction addressing voluntary intoxication, which the trial court overruled. *See* Tex. Code Crim. Proc. Ann. art. 36.15 (West 2006).

35

## III. ALLEGED ERRORS OCCURRING AT PUNISHMENT

### A. ADMISSION OF DRUG EVIDENCE

In his sixth point, Damm asserts that the admission at punishment of several drug-related items, which were seized during the search of his home on December 12, was error because those items were seized outside the scope of the search authorized by the warrant.[12] The warrant authorized any peace officer to search Damm's home and his and Verran's vehicles for "[a]ny item used to record or store video footage and still photographs"; "[p]hotographs of the residence and items seized"; "[p]ersonal identification belonging to Casey Egbers"; and "[a]ny blood, hair, or saliva evidence that could contain DNA of Casey Egbers, or the body of Casey Egbers." *See* Tex. Code Crim. Proc. Ann. art. 18.02(a)(10) (West Supp. 2017). When the State proffered several photographs of the drugs found during the search as well as baggies and pill bottles containing the drugs, Damm objected and argued that one of the executing officers, Officer Joshua Bennett, had not seen the warrant and was searching solely for drugs, which was outside the scope of the warrant.[13] Indeed,

---

[12]Damm stipulated that the items seized from his home were controlled substances; thus, that was "not an issue in dispute" during the punishment phase of his trial.

[13]In his statement of this point challenging the drug evidence, Damm also refers by exhibit number to two photographs of the computer seized at his home. The computer was expressly within the scope of the warrant, and Damm did not object at trial to its admission. He also challenges the admission of State's exhibits "109C, 109D, 109E, [and] 109F." There were no such exhibit numbers admitted at trial. The State's exhibits specifically challenged by Damm and that

Bennett had testified that he was an undercover narcotics officer, that he assisted in the December 12 search of Damm's home, and that he was specifically looking for items related to drugs and drug dealing. He further testified that many of the drug items were in plain view in the home and that Murphree directed him to look for items "related to a homicide." The trial court overruled Damm's objection based on the plain-view doctrine and admitted the photographs of the seized drugs.

Although the United States Constitution, the Texas Constitution, and the code of criminal procedure prohibit unreasonable searches and seizures, an article in plain view may be seized notwithstanding those protections. *See* U.S. Const. amend. IV; Tex. Const. art. I, §§ 9–10; Tex. Code Crim. Proc. Ann. art. 38.23(a) (West 2005); *Walter v. State*, 28 S.W.3d 538, 540–41 (Tex. Crim. App. 2000). Because the article is in plain view, neither its observation nor its seizure violates constitutional principles. *See Walter*, 28 S.W.3d at 541. The plain-view doctrine requires that (1) the police must have a right to be in the location where the article is in plain view and (2) the article found in plain view must be evidence that leads the police to have the immediately apparent belief that the article may be evidence of a crime, contraband, or otherwise subject to seizure. *See id.*; *Carmen v. State*, 358 S.W.3d 285, 293–94 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

---

we have addressed are State's exhibit numbers 11–14, 17–18, 29–31, 38–40, 49, 102–07, and 199A–199F.

37

Here, Bennett and the other officers executing the search warrant had the right to be in Damm's home under the terms of the warrant. Bennett saw the drug items immediately upon entering the home, which he recognized as contraband based on his training as a narcotics officer. Bennett's subjective intent to look for items of a drug offense is irrelevant for purposes of the Fourth Amendment. *See Green v. State*, 78 S.W.3d 604, 609–10 (Tex. App.—Fort Worth 2002, no pet.). Additionally, other evidence of Damm's history with drugs was admitted without objection at guilt–innocence and at punishment, and Damm's counsel repeatedly stated in closing jury argument at guilt–innocence that Damm was a "drug dealer." This evidence, along with Damm's counsel's characterizations during jury argument, would lead us to conclude beyond a reasonable doubt that any error in the admission of the challenged drug evidence did not contribute to Damm's punishment. *See* Tex. R. App. P. 44.2(a). We overrule point six.

### B. ADMISSION OF TEXT MESSAGE

At punishment, the State called Bagley as a witness to testify that after her relationship with Damm ended in 2009, he came to her home, "pulled up in his car, parked on the street, came out of his car, yelling and screaming, calling [her] a whore, calling [her] a slut, calling [her] a bitch." In 2015, Bagley heard that Damm was talking about the altercation to others. Bagley texted Damm and asked if he had said that he "came there that day [in 2009] to shoot [her] in [her] vagina." Damm responded that he "only said that to scare" Bagley. Before the

38

State called Bagley as a witness, Damm objected because the State's notice did not specify the dates on which Damm called her names and told others that he had threatened to shoot her. Damm specified that the date given by the State— "@ 2009-10"—was too broad to comply with the specificity required by statute, but he conceded that he was not claiming surprise. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(g). The trial court overruled Damm's objection and allowed Bagley to testify. Damm also objected to the admission of these texts on the bases of hearsay and insufficient authentication. The trial court overruled his objections and admitted the text exchange. On appeal, Damm raises the same challenges to the text-message evidence: hearsay, insufficient authentication, and insufficient notice. *See id.*; Tex. R. Evid. 801, 901.

In his tenth point, Damm asserts that the text was inadmissible hearsay "because it was not linked to a party opponent as claimed by the State." *See* Tex. R. Evid. 801. But the text was not hearsay because it was an adoptive admission. *See* Tex. R. Evid. 801(e)(2)(B). Statements made by others in a defendant's presence may be admissible as nonhearsay, adoptive admissions if the defendant "by his actions and responses, showed agreement with the statements." *Paredes v. State*, 129 S.W.3d 530, 534 (Tex. Crim. App. 2004). The State has the burden to prove to the trial court by a preponderance that the testimony qualified as an adoptive admission. *Alvarado v. State*, 912 S.W.2d 199, 215 (Tex. Crim. App. 1995). By admitting the texts, the trial court found that the State had met its burden, which we review for an abuse of discretion. *See id.*

39

After Bagley confronted Damm with the fact that he told others in 2015 that he went to her home in 2009 to shoot her, Damm did not deny it in the text exchange. He merely said that he wanted to scare her. Bagley testified that the number she received the texts from was the number she used to communicate with Damm. We conclude that the trial court did not abuse its discretion by admitting the texts into evidence at punishment as an adoptive admission by Damm. *See, e.g.*, *Burrell v. State*, 445 S.W.3d 761, 766 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd); *Jolley v. State*, No. 2-04-503-CR, 2006 WL 176730, at *9–10 (Tex. App.—Fort Worth Jan. 26, 2006, pet. ref'd) (mem. op., not designated for publication). We overrule point ten.

Damm's authentication argument raised in his eleventh point is similarly unavailing. To authenticate an item of evidence, the proponent must proffer sufficient evidence "to support a finding that the item is what the proponent claims it is." Tex. R. Evid. 901(a). Even so, a trial court makes only a preliminary determination regarding authenticity and admissibility, which we review for an abuse of discretion, leaving for the jury the ultimate question of whether the item actually is what the proponent says it is. *See Tienda v. State*, 358 S.W.3d 633, 637–38 (Tex. Crim. App. 2012); *see also* Tex. R. Evid. 104(a). Here, it is within the zone of reasonable disagreement that the State met its burden to proffer sufficient evidence to support a preliminary finding that the text messages were authored by Bagley and Damm. *See Gardner v. State*, No. 02-14-00459-CR, 2015 WL 4652718, at *1–2 (Tex. App.—Fort Worth Aug. 6, 2015, pet. ref'd)

40

(mem. op., not designated for publication). Indeed, Bagley testified that the number she texted in 2015 was the number she had routinely used to communicate with Damm. The trial court did not abuse its discretion, and we overrule point eleven.

In his thirteenth point, Damm argues that the text exchange was inadmissible because the State did not give him the statutorily required pretrial notice. As we recounted before, the State notified Damm before trial that it intended to introduce evidence that Damm threatened to shoot Bagley "@ 2009-10" and confirmed that he had said so on August 18, 2015. As with his other points directed to the text exchange, we review the trial court's admissibility ruling over Damm's article 37.07 objection for an abuse of discretion. *See Wallace v. State*, 135 S.W.3d 114, 118 (Tex. App.—Tyler 2004, no pet.).

Although article 37.07's notice requirements are mandatory, the State's failure to strictly comply does not, on its own, result in appellate relief for Damm. We must conclude not only that the State failed to substantially comply with the notice requirements but also that the admission of such evidence was harmful. *See id.* Harmful error occurs if the deficient notice resulted from prosecutorial bad faith or prevented Damm from preparing for trial. *See id.* To determine whether Damm was prevented from preparing for trial, we look at whether he was surprised by the substance of the testimony and whether that affected his ability to prepare cross-examination or mitigating evidence. *See id.* at 118–19. Damm has not asserted either prosecutorial misconduct or surprise. Indeed,

Damm specifically told the trial court that he was "not claiming surprise" but was resting solely on the State's noncompliance with the statutory provisions. Therefore, we would be unable to conclude that the admission of the bad-act evidence, even if the State failed to substantially comply with article 37.07, resulted in any harm to Damm. We overrule point thirteen.

## IV. CONCLUSION

Having overruled each of Damm's sixteen points on appeal, we affirm the trial court's judgment.

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL: SUDDERTH, C.J.; GABRIEL and KERR, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: March 29, 2019